## T. H. CALLOWAY v. STATE.

No. A-5863. Opinion Filed Jan. 9, 1928.
(262 Pac. 696.)

Brown, Brown & Williams, for defendant in error.

George F. Short, Atty. Gen., and Leverett Edwards, Asst. Atty. Gen., for the State.

DOYLE, P. J.   On information, in substance, charging that in Carter county, on or about the 5th day of September, 1924, T. H. Calloway did shoot and kill one Alfred Wells with an automatic pistol, he was tried and convicted of manslaughter in the first degree; the jury by their verdict fixing his punishment at confinement in the penitentiary for a term of 20 years.   Motion for a new trial was duly filed and overruled, and from the judgment pronounced in pursuance of the verdict, he appeals.

For a proper understanding of the question raised a brief statement of the facts will be necessary.

It appears that the deceased, Alfred Wells, was an Indian, who with his wife and children lived on a farm in Carter county, about a mile from the home of the defendant. On the day previous to the one on which the deceased was killed the defendant had gone to the home of Alfred Wells, during his absence, and had taken the sideboards of a wagon belonging to Wells, but which wagon was in the possession of the defendant. Shortly afterwards Alfred Wells appeared, and there was a difficulty between the two men over the wagon in question. During the difficulty the defendant knocked Wells down two or three times.

The evidence shows that on the following evening, near sundown, the defendant and his wife and a neighbor named Scanlan were at the defendant's place, when Mrs. Calloway observed Alfred Wells coming towards the house driving a team with the harness on, evidently for the purpose of taking away his wagon. The defendant took his gun, and went out to the gate. Wells put his hand on the gate, whereupon the defendant drew his pistol and fired one shot. The bullet struck Wells on the right temple, midway between the ear and eye, killing him instantly.

Julia Davis testified that Alfred Wells lived on her place in a tenant house, about 20 steps from her home; that the defendant was there the day before Wells was killed, and at that time she saw him knock Alfred Wells down with his fist; that when Wells got up, defendant knocked him down again; that he was there on the ground about an hour, and she went over to see if he was living or dead, and found that he was still breathing; that some other parties came up, and she went back to the house.

W. E. Scanlan testified that he lived about three-quarters of a mile from the defendant, and was present when Alfred Wells was killed; that he was in the house talking to defendant, and his wife said, "There comes Alfred." The defendant walked to the door, came back, then went in the adjoining room, then came back, put his hat on and walked out, and he followed him. At that time Alfred Wells was about 50 yards down the road, coming towards them, driving a team with the harness on. That he drove up to the gate, and dropped his lines. The defendant said, "Alfred, what are you going to do?" and he said, "Get that wagon"; the defendant said, "What about my hog wire?" and he said, "If you want your damn hog wire go get it." The defendant was standing with his right hand in his jumper pocket. Mr. Wells was standing about three steps away. They were directly face to face. The defendant said, "Alfred, you open that gate, and I will kill you." The defendant said that three or four times. Alfred pulled the latch, and defendant jerked his pistol and fired. Alfred Wells turned completely around and fell on his back.

As a witness in his own behalf, the defendant testified that he lived a little less than a mile from the place that Alfred Wells farmed; that he had given some hog fence wire to Wells for an old wagon; that with Mr. Scanlan he went to Wells' place to get the sideboards of the wagon; that Wells was not at home; that he took the sideboards, and as they were leaving they met Wells; that they had an altercation; that Wells became impudent, and he knocked him down; that he knew that Wells had a Winchester and a six shooter in the house, and he was trying to keep him from going to the house. Then he told Mr. Scanlan to hold Wells until he could get away, and he drove rapidly away. About 30 minutes later Mr. Scanlan came to his home, and told him of threats made by Alfred Wells against him. The next

day, with Mr. Scanlan, he went to the sheriff's office; then they returned to his home. About 5 o'clock that evening he was talking to Mr. Scanlan, when his wife said, "Yonder comes Alfred Wells." He looked out, and saw him coming. Then he put his pistol in his pocket, and walked out to the gate. Mr. Scanlan followed him; that Wells stopped at the gate, and he said, "Alfred, what do you want?" Wells said, "I am after my wagon." He told him, "Alfred, you are not going to get the wagon until you bring my wire back, and then I will take it to you." That Wells started to open the gate, and he said, "Alfred, don't go in there, I will hurt you," and he told Wells that three times. Wells put his hand on the gate, and said, "When I get through with you, you will not need a wagon;" at the same time threw his other hand back toward his hip pocket; then he shot Wells. Asked, "Why did you shoot him?" he answered, "I was afraid I was going to get killed."

In support of the contention of counsel that the judgment should be reversed and a new trial awarded, several errors are assigned, only two of which are argued. The first is alleged misconduct of the trial court. The record shows that John W. Ginn, deputy sheriff, as a witness for the defendant, testified that he was in the sheriff's office when the defendant and Mr. Scanlan came there on the day of the homicide. He was then asked:

"Did he ask or seek protection there? What were they doing there? (The state objected.)

"By the Court: Sustained; I will let you make your record, Mr. Brown, but I will send the jury out before I do it.

"Counsel for defendant: We want the record to show what we expect this witness to testify. Further, we want the record to show the conduct of the court in laughing at defendant's counsel, and we except both to the action of the court and the demeanor of the court.

"By the Court: The court is not laughing at defendant's counsel, and, if you make that statement again, you will find yourself in contempt of court, and the court will fine you. Do you want the jury withdrawn?

"Counsel for defendant: We do. We except to the conduct of the court and the ruling of the court. (Here the jury retires to their room.)

"Counsel for defendant: The defendant expects the witness to testify, and such testimony is true, that the defendant came to the sheriff's office in the city of Ardmore at a time when this witness was a deputy sheriff, and the defendant tried to get protection, at which time this witness informed defendant he could not give him protection, but that he would have to go back and protect himself.

"The Court: Which offer and tender of proof is rejected, for the reason that it is incompetent, irrelevant, and immaterial, and is a self-serving declaration. (Here the defendant again objects to the action and demeanor of the court and the statement of the court.)

"By the Court: Mr. Brown, the attorney who was making the objection, jumped up and attempted to make the statement as to what he expected the witness to testify in the presence of the jury, without the jury being withdrawn, and Mr. Brown persisted in stating in the record his statement in the presence of the jury."

The record contains a further statement by the court, in the absence of the jury, wherein the court expressly makes a finding that the statement of counsel as to the alleged improper conduct of the court was not true, and wherein the court offered to permit counsel for the defendant to file in the record any affidavit or other proof that he may have, either now or at any time during the progress of the trial, showing, or tending to show, that the court acted in any improper manner. The record fails to show that any such proof was offered, and the question argued is not presented by the objection as made.

What the defendant said to Deputy Sheriff Ginn, and what said Ginn said to him, would be merely self-serving

declarations, and the objections thereto were properly sustained.

The remark of the court that, "If you (referring to defendant's counsel) make that statement again, you will find yourself in contempt of court, and the court will fine you," may have been improper, having been made in the presence of the jury. However, the rule is well settled that it is not every improper remark of a trial court that will justify a reversal. If the remarks are such as might reasonably influence the jury against the defendant, a new trial should be granted; but, if after a full consideration of the entire record, it is clear that the verdict is right, and that, even if the remarks had not been made, the jury could not have reasonably returned a different verdict, the judgment will be affirmed.

Our Code of Criminal Procedure (section 2822, C. O. S. 1921) provides that no judgment shall be set aside or new trial granted unless it appears that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right.

By this provision this court is forbidden to reverse a judgment of conviction for error, unless, after an examination of the entire record, it is of the opinion that the error has probably resulted in a miscarriage of justice. It thus makes it the duty of this court in considering the questions of law presented to examine the entire record, including the evidence. It follows that this court is necessarily vested with a large discretion in determining the effect of errors, and each case must depend upon its own circumstances, since it is the opinion of the court, upon a full consideration of the particular record, including the evidence, that is to control upon the question whether the error complained of has resulted in a miscarriage of justice.

In Jones v. State, 20 Okla. Cr. 154, 201 P. 664, it is said:

"The remarks of the court were unfortunate, but the attitude of the attorneys was in some measure responsible for this. The defendant and his attorneys cannot be heard to complain of matters brought on by their own wrong. If the rule were otherwise, any defendant in a criminal case would have it within his power to inject reversible error into his case, and so defeat the ends of justice."

And see Wilson v. State, 17 Okla. Cr. 47, 183 P. 613; Harper v. State, 20 Okla. Cr. 43, 200 P. 879; Pusley v. State, 22 Okla. Cr. 192, 210 P. 306; Shields v. State, 32 Okla. Cr. 344, 240 P. 661.

Considering all that transpired as shown by the record, we are of opinion that the defendant has no just ground of complaint.

The only remaining assignment of error argued is that the court erred in overruling his motion to set aside and vacate the judgment rendered herein upon the ground of newly discovered evidence. The judgment was rendered on June 12, 1925. The motion to set aside was filed on July 6, 1925.

The alleged new evidence is in substance to the effect that the deceased had purchased a gun a long time before the killing. There is no dispute about the deceased owning a gun of that type. The alleged new evidence was to the effect that a gun of this character was found 50 or 60 feet from the scene of the homicide, nearly five months after the killing.

The court, in overruling the motion, in part stated:

"The pants worn by the Indian at the time of his death were exhibited to the jury and the court, and the pockets in the pants were called to the attention of the court and jury. The testimony shows that at the time the Indian was facing north and the defendant, Tom Cal-

Ioway, was standing southeast of the Indian in a plain line of vision with the right hip pocket. Tom Calloway refused to testify that the Indian had a gun, and no gun was found at the scene of the homicide. The hip pocket such as was in these pants could not have concealed a .41 pistol. That would have been a physical impossibility. Especially when the defendant was standing in plain view of that hip pocket and saw no gun. * * * That this testimony at its best shows that the gun was dropped 50 or 60 feet from the homicide. If he had a gun, and dropped it on the way, that would not give this defendant the right to kill him."

It is a well-settled rule that a motion for a new trial upon the ground of newly discovered evidence, made before judgment or after the judgment was rendered and sentence pronounced, is addressed to the discretion of the trial court, and its ruling thereon will not be disturbed, except for an abuse of discretion; the presumption being that the discretion was properly exercised.

The motion here, we think, is wholly without merit, and was properly overruled.

Upon the record as a whole, we think, after a careful survey of the facts in evidence, that there was no element of self-defense in this case. Considering the testimony of all the witnesses in the case, excepting that of the defendant, it seems clear to us that the defendant should have been convicted of murder. No person has the right to kill another through unfounded fear or cowardice, and while the defendant's account of the killing differs somewhat from that given by the other eyewitness, he is, we think, guilty of murder upon his own statement. However, the court submitted the question of manslaughter in the first degree, and the jury found the defendant guilty of this lower degree.

It is the province of the jury, if the defendant is found guilty, to determine and fix the degree by their verdict, and it has been uniformly held by this court that,

if the jury in a homicide case find the defendant guilty of a lower degree, where the law and the facts make it murder, it is an error in favor of the defendant, of which he cannot complain. Juries frequently render just such verdicts, and this can only be accounted for upon the theory that the verdict was the result of a compromise of opinion.

It appearing that the defendant had a fair and impartial trial, and that no error was committed prejudicial to his substantial rights, the judgment appealed from is affirmed.

EDWARDS and DAVENPORT, JJ., concur.